**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| TYLER JAMES McILVAIN, | CASE NO. 5:25-CV-00505 |
| Plaintiff, | |
| vs. | JUDGE BENITA Y. PEARSON |
| | MAGISTRATE JUDGE AMANDA M. KNAPP |
| COMMISSIONER OF SOCIAL SECURITY, | |
| Defendant. | **REPORT AND RECOMMENDATION** |

Plaintiff Tyler James McIlvain ("Plaintiff" or "Mr. McIlvain") seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Commissioner") denying his applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI").  (ECF Doc. 1.)  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This matter has been referred to the undersigned Magistrate Judge for a Report and Recommendation pursuant to Local Rule 72.2.

For the reasons set forth below, the undersigned recommends that the final decision of the Commissioner be **AFFIRMED**.

## I.  Procedural History

Mr. McIlvain filed his DIB and SSI applications on May 25, 2022, alleging disability beginning April 15, 2021.  (Tr. 18, 86-87.)  He alleged disability due to: agoraphobia, arthritis in the knees, avoidant personality, bipolar disorder, severe anxiety, severe depression, and severe

1

social anxiety.  (Tr. 135, 149, 257.)  His applications were denied at the initial level (Tr. 132-39) and upon reconsideration (Tr. 147-52).  He then requested a hearing.  (Tr. 153-54.)

Following a telephonic hearing before an Administrative Law Judge ("ALJ") on January 22, 2024 (Tr. 18, 51-85), the ALJ issued a decision on March 4, 2024, finding Mr. McIlvain had not been under a disability within the meaning of the Social Security Act from April 15, 2021, through the date of the decision.  (Tr. 15-37.)  Mr. McIlvain sought review of the decision by the Appeals Council.  (Tr. 230-32.)  On January 30, 2025, the Appeals Council found no reason to review the decision, making the decision the final decision of the Commissioner.  (Tr. 1-7.)  On March 14, 2025, Mr. McIlvain filed a Complaint challenging the decision (ECF Doc. 1), and the matter is fully briefed (ECF Docs. 7 & 8).

## II.     Evidence

### A.     Personal, Educational, and Vocational Evidence

Mr. McIlvain was born in 1993.  (Tr. 31, 58.)  At the time of the hearing, he lived with his fiancée and autistic son.  (Tr. 58-59.)  He graduated from high school.  (Tr. 31, 59.)  His past relevant work included: production assembler, saw blade sharpener, and saw operator.  (Tr. 31, 60-64, 80-81.)

### B.     Medical Evidence

While the ALJ found Mr. McIlvain had severe physical impairments (Tr. 20), Mr. McIlvain only challenges the ALJ's findings regarding his mental impairments (ECF Doc. 7, pp. 1, 8-23).  The medical records summarized herein are therefore limited to the evidence pertaining to Mr. McIlvain's mental impairments.

2

### 1.      Relevant Treatment History

On June 7, 2021, Mr. McIlvain presented to Cici Dorando, LPC, at Phoenix Rising

Behavioral Healthcare and Recovery, Inc. ("Phoenix Rising") for a comprehensive assessment.

(405-13.)  His mother attended the assessment with him, and she provided most of the

background regarding Mr. McIlvain's mental health struggles.  (Tr. 405.)  Mr. McIlvain's mother

said that she often talked for her son due to his inability to talk to other people.  (*Id*.)  Mr.

McIlvain verified the accuracy of his mother's claim that he usually could not speak for himself,

stating he went blank and was nervous around new people.  (*Id*.)  Mr. McIlvain's mother

reported that Mr. McIlvain saw his primary care physician for depression and anxiety, and she

said he could not hold a job due to his inability to deal with people.  (*Id*.)  He was trying to get

long term disability and was working with his primary care physician until he could establish

care at Phoenix Rising.  (*Id*.)  Mr. McIlvain reported that he lived with his fiancée of six years

and his three-year-old son.  (Tr. 406.)  He was estranged from his biological father, but reported

that he was close to his stepfather and identified his cousin and brother as social supports.  (Tr.

406-07.)  He said he enjoyed hunting, fishing, and being outdoors.  (Tr. 407.)  On examination,

his appearance, build/stature, perception, thought content, and cognition were within normal

limits.  (Tr. 409.)  His speech was clear, and he denied hallucinations, but he was tense, anxious,

and he avoided eye contact.  (*Id*.)  His mood was depressed, his affect was flat, and his thought

process was blocked.  (*Id*.)  He exhibited average intelligence, but he had difficulty

acknowledging the presence of psychiatric problems.  (*Id*.)  His ability to make reasonable

decisions was described as mild.  (*Id*.)  He admitted to suicidal thoughts but reported that this

family was a protective factor.  (Tr. 405, 411.)  It was noted that Mr. McIlvain had mood swings

and would become very angry. (*Id.*) LPC Dorando recommended a psychiatric evaluation and counseling. (Tr. 413.)

On June 16, 2021, Mr. McIlvain presented to Catherine Buswell, APRN CNP, at Phoenix Rising for a psychiatric evaluation relating to his anxiety and depression. (Tr. 397-403.) His mother was present during the evaluation. (Tr. 398.) He reported extreme difficulty functioning and trouble keeping jobs. (Tr. 397.) He last worked on April 5, 2021, and was seeking an extension of his short-term disability. (*Id.*) His fiancée worked nights, so he watched their autistic son. (*Id.*) He denied any traumatic events that left him with nightmares or flashbacks. (*Id.*) His mental status examination revealed abnormal and normal findings. (Tr. 400-01.) He was tense with intermittent eye contact, his mood was anxious and depressed, and his affect was constricted. (Tr. 400.) Auditory hallucinations were noted, and his thought content was described as "[p]reoccupations / ruminations Depressive." (Tr. 401.) But he was cooperative, his appearance, activity, perception, insight, and judgment were within normal limits, his speech was clear, and his intelligence was estimated to be average. (Tr. 400-01.) Mr. McIlvain was diagnosed with recurrent severe episode of major depression with psychotic symptoms and generalized anxiety disorder; psychological testing was recommended to rule out bipolar and dependent personality disorder. (Tr. 401-03.) CNP Buswell prescribed Lexapro (10 mg once a day) and Geodon (40 mg once a day). (Tr. 402-03.)

On July 16, 2021, Mr. McIlvain returned to LPC Dorando for behavioral health cognitive therapy. (Tr. 395-96.) He reported no change with his medications (Tr. 395), but also reported that the medication had helped stabilize his mood at home (Tr. 396). He said he hoped to increase his motivation so he could return to work (Tr. 395), but he also said that "the driver of [his] mood instability [was] the dread of having to go to work" and that his "quality of life [was]

so much better" when he did not have to "worry about money and work" (Tr. 396).  Mr. McIlvain was instructed to follow up with counseling in two weeks.  (*Id.*)

On July 22, 2021, Mr. McIlvain returned to CNP Buswell for a medication management appointment.  (Tr. 387-90.)  He said he was doing "[a]lright."  (Tr. 387.)  He said his sleep was "hit or miss."  (*Id.*)  He estimated getting five or six hours of sleep per night.  (*Id.*)  He said his energy and motivation were "normal I suppose."  (*Id.*)  His appetite was "good."  (*Id.*)  He denied suicidal or homicidal ideation, hallucinations, and medication side effects.  (*Id.*)  He was on short-term disability and not sure when he would return to work.  (*Id.*)  On examination, Mr. McIlvain was noted to have anxiety and anhedonia.  (Tr. 389.)  Otherwise, his examination findings were normal.  (Tr. 388, 390.)  He was oriented to time, place, person, and situation; no agitation was observed; his mood and affect were appropriate; his behavior was appropriate for his age; there was no compulsive behavior; his language and fund of knowledge were sufficient; he was not in denial, euphoric, or fearful; there was no flight of ideas or grandiosity; he was not forgetful; there were no hallucinations, increased activity, memory loss, mood swings, obsessive thoughts, or paranoia; his insight, judgment, attention span, and concentration were normal; there was no pressured speech; and there was no suicidal ideation.  (Tr. 390.)  His appearance was within normal limits, and he was cooperative with average eye contact.  (Tr. 388.)  He was described as making "[g]ood progress."  (Tr. 387.)  CNP Buswell prescribed Lexapro (10 mg once a day) and Geodon (60 mg once a day).  (Tr. 389.)  On July 26, 2021, Mr. McIlvain met with LPC Dorando for a counseling session.  (Tr. 384-86.)  He presented with anxiety and continued to report that he did not feel he could work.  (*Id.*)

On August 11, 2021, Mr. McIlvain's mother called Phoenix Rising and spoke with LPC Dorando; she was concerned that her son was pacing more than normal, feeling low/down, could not sleep, and was panicking about everything and restless since his medication was increased.

(Tr. 383.)  She did not think he was "in a good place" and did not think that his medication was the "right medication for him."  (*Id*.)  She said he was leaving for camping trip on the weekend, and she was "concerned he [would] be moody and blow up."  (*Id*.)  She said her son denied suicidal thoughts.  (*Id*.)  LPC Dorando indicated she would inform CNP Buswell.  (*Id*.)

On August 31, 2021, and September 24, 2021, Mr. McIlvain presented to Psychologist Robert Humphries, Ph.D., at Vista Psychological & Counseling Centre, LLC for a psychological evaluation at the request of his Phoenix Rising psychiatric nurse practitioner.[1]  (Tr. 416-20.)  Dr. Humphries indicated that Mr. McIlvain's MMPI-2 testing suggested an "extreme tendency to overstate problems" which "could reflect acute distress, a high degree of self-criticism, and a desire for assistance."  (Tr. 417.)  He concluded that the overall findings of the evaluation suggested that Mr. McIlvain "demonstrate[d] an average level of cognitive functioning."  (Tr. 419.)  The evaluation showed that Mr. McIlvain had "problems with respect to his nonverbal skills cognitively" and "[b]oth nonverbal cognitive subtests [were] associated with underlying neurological involvement."  (*Id*.)  Mr. McIlvain showed "signs of depression and anxiety on personality assessment" and he "experience[d] a tremendous amount of overwhelmed feelings." (*Id*.)  Dr. Humphries noted that the evaluation and testing suggested the presence of psychotic process.  (*Id*.)  Dr. Humphries indicated that Mr. McIlvain would need "medical management aimed at reducing depressed and anxious symptoms," and "may need to take into account the possible psychotic process that may be accompanying the depressive symptoms."  (Tr. 420.)  Dr. Humphries felt that Mr. McIlvain "would benefit from a treatment approach drawing from an interpersonal psychotherapy" since he was "having trust issues and display[ed] personality traits associated with an avoidant personality disorder."  (*Id*.)  Dr. Humphries felt the source of Mr.

---

[1] A conference was held on November 4, 2021, and Dr. Humpries issued his report on December 19, 2021.  (*Id.*)

McIlvain's anxiety might "be found in the cognitive vulnerability nonverbally," and that he might "need to seek a consultation with a neurologist." (*Id*.)

In addition to seeing Dr. Humphries for evaluation in September 2021, Mr. McIlvain met with providers at Phoenix Rising. On September 1, 2021, he returned to CNP Buswell for medication management. (Tr. 379-82.) He reported that he was "still really restless" and said he struggled with sitting, but he was able to stay still during the 30-minute appointment. (Tr. 379.) He denied current voices and said that his sleep was better and his appetite was good. (*Id*.) He denied suicidal and homicidal ideation. (*Id*.) He said he had been staying home with his son and felt he would do better staying home permanently. (*Id*.) At the end of the appointment, Mr. McIlvain asked about extending his long-term disability. (*Id*.) CNP Buswell reviewed information with him and noted that he had reported doing better. (*Id*.) Mr. McIlvain responded, indicating that he did better when he was not working and had struggled to keep a job since he was 18 years old. (*Id*.) He felt that his voices, anxiety, and depression worsened when he worked. (*Id*.) CNP Buswell noted that Mr. McIlvain might be malingering at times for secondary gain, and she indicated that Mr. McIlvain had been sent to Dr. Humphries for diagnostic clarification. (*Id*.) On mental status examination, Mr. McIlvain was depressed, but his appearance, posture, activity, perception, thought content, cognition, insight, and judgment were within normal limits. (Tr. 380.) His eye contact was average, and he was cooperative. (*Id*.) His thought process was logical, his speech was clear, and his affect was full. (*Id*.) He was diagnosed with major depressive disorder recurrent severe without psychotic features, generalized anxiety disorder, and social anxiety disorder. (Tr. 382.) CNP Buswell noted that Mr. McIlvain had stopped Lexapro. (Tr. 381.) She prescribed Abilify for mood and history of psychosis and started him on propranolol for akithesia and anxiety. (Tr. 381-82.) CNP Buswell

did not feel that Mr. McIlvain met the criteria for long term disability at that time.[2]  (Tr. 381.)
On September 15, 2021, Mr. McIlvain presented to Jennifer Elliott, LPN, at Phoenix Rising for a
medication management nurse appointment.  (Tr. 376-78.)  His mother was present at the visit
and added to most of Mr. McIlvain's responses to the nurse's questions.  (Tr. 377.)  His mother
reported that her son was not physically or mentally able to go to work, indicating that thinking
about having to go to work or having the responsibility to go to work caused him anxiety.  (*Id*.)
She also said he could not order his own food at a drive thru.  (*Id*.)

Seven months later, on April 20, 2022, Mr. McIlvain met with Matthew Gooch, APRN,
one of his primary care providers at Internal Medicine Physicians, regarding his diagnoses of:
avoidant personality disorder; recurrent major depressive episodes, moderate; generalized
anxiety disorder; and gastroesophageal reflux disorder.  (Tr. 438-41.)  Mr. McIlvain reported that
his mood had improved overall since starting Wellbutrin, but he continued to have anxiety that
prevented him from holding a job.  (Tr. 440.)  He said he was sleeping well.  (*Id*.)  He was not
seeing a counselor and said that he did not feel it was helpful when he saw counselors in the past.
(*Id*.)  On examination, his insight and judgment were good; he was oriented to time, place, and
person; and he was active, alert, and anxious.  (*Id*.)  APRN Gooch recommended that Mr.
McIlvain continue Wellbutrin since his depression had improved, and look for a new counselor.
(*Id*.)  APRN Gooch also started Mr. McIlvain on a low dose of diazepam to address his
generalized anxiety disorder.  (*Id*.)

On May 23, 2022, Mr. McIlvain returned to APRN Gooch regarding his diagnoses of:
avoidant personality disorder; recurrent major depressive episodes, moderate; and generalized
anxiety disorder.  (Tr. 434-37, *see also* Tr. 429-31.)  Mr. McIlvain reported taking diazepam 5

---

[2] She also noted that Mr. McIlvain's mother had called the office and screamed at the clinical director about forms
that had to be completed, called the office five times, and left messages for his counselor. (Tr. 381.)

mg every day, but said he continued to have anxiety in social situations and was unable to pursue employment.  (Tr. 436.)  He constantly worried about and feared being in social situations.  (*Id*.)  He had a social support system at home and said he was looking for a counselor.  (*Id*.)  Mental status examination findings were unchanged from his April 20, 2022 visit.  (*Compare* Tr. 436 *with* Tr. 440.)  APRN Gooch indicated that Mr. McIlvain's generalized anxiety disorder was chronic, severe, and worsening, and referred him to a psychiatrist, noting that the primary care provider had exhausted all treatment plans.  (*Id*.)  With respect to Mr. McIlvain's recurrent major depressive episodes, moderate, APRN Gooch indicated that Mr. McIlvain's depression had improved since starting Wellbutrin and Mr. McIlvain was going to pursue finding a new counselor.  (*Id*.)  With respect to Mr. McIlvain's avoidant personality disorder, APRN Gooch discussed psychotherapy with Mr. McIlvain and recommended that Mr. McIlvain call his insurance to pursue.  (*Id*.)

On May 23, 2022, Mr. McIlvain also presented to Shelley M. Weatherspoon, MSW, LSW, at CommQuest for an assessment.  (Tr. 490-99.)  He reported diagnoses of social anxiety and chronic depression.  (Tr. 491.)  His reported symptoms included: restlessness, excessive difficultly controlling anxiety and worry, irritability, sleep disturbance, muscle tension, chest pain / discomfort, sweating, palpitation, pounding and accelerated heart rate, trembling or shaking, feeling dizzy, unsteady and lightheaded, shortness of breath, fear of losing control or going crazy, fear of dying, worry about consequences of attack, persistent concern about additional attacks, change in behavior related to attacks, extreme panic, intrusive distressing recollections, distressing dreams, acts or feels as if event were recurring, intense distress at exposure to cues, physiological reactivity to cues, difficulty falling asleep, difficulty staying asleep, irritability and angry outbursts, difficulty concentrating, hypervigilance, diminished

interest or participation in activities, detachment or estrangement from others, restricted range of affect, and sense of foreshortened future.  (Tr. 491-92.)  He reported good relationships with his mom and brother and reported that he and his fiancée had been together for nine years and had an autistic son.  (Tr. 492.)  He reported having four cats and one dog and said they were fun to be around.  (*Id*.)  He felt he was a good parent to his son.  (*Id*.)  He identified his strengths as being a good caregiver, making people feel better, and his "reliance to family and friends," and he said his weakness was being unable to provide for himself or his family.  (Tr. 493.)  He said he could cook, clean, and take care of himself.  (*Id*.)  He felt safe both inside and outside his home.  (*Id*.)  He denied any intellectual disability, learning disorder, motor skill disorder, or communication disorders.  (Tr. 494.)  He reported having a high school degree and indicated that he had not received special education services.  (*Id*.)  He was unemployed and looking for work, but said he struggled with employment due to symptoms that occurred during work.  (Tr. 495.)  He had held many jobs over the prior ten years, but none lasted more than 13 months.  (*Id*.)  On examination, Mr. McIlvain appeared clean and neat; he was oriented to person, place, time, and situation; he was alert with good eye contact and concentration; his motor activity was described as "normal, restless"; his speech was normal, his memory was intact, his affect was flat and restricted; his mood was anxious and depressed; his attitude was cooperative; his thought process was logical; his thought content was appropriate; his judgment, impulse control, and insight were good; and no hallucinations were reported.  (Tr. 496.)  LSW Weatherspoon recommended an evaluation for medication management and counseling.  (Tr. 498.)

On July 5, 2022, Mr. McIlvain and his mother met with LSW Weatherspoon for a counseling service plan meeting.  (Tr. 500-02.)  The plan included individual therapy one to two times per month medication management services.  (Tr. 501-02.)

On July 14, 2022, Mr. McIlvain presented to Kristen Miller, CNP, RN, at CommQuest for a psychiatric evaluation.  (Tr. 503-06.)  Mr. McIlvain's mother, who was present at the evaluation, initially did most of the speaking.  (Tr. 504.)  Mr. McIlvain started to communicate for himself as the appointment progressed.  (*Id*.)  He said he was taking Wellbutrin and indicated it was the only medication that had been "slightly helpful".  (*Id*.)  He rated his depression a 7 out of 10 with 10 being the worst, and he said his anxiety was to the point that he had somatic symptoms.  (*Id*.)  He denied suicidal ideation.  (*Id*.)  He was living with his fiancée and their autistic four-year-old son.  (*Id*.)  He reported problems sleeping, but he said his sleep problems were directly related to his son's sleep pattern, which was also disturbed.  (*Id*.)  He said he could not keep jobs due to his significant anxiety, racing thoughts, and paranoia, and noted he had not held a job for more than a year.  (*Id*.)  He was diagnosed with major depressive disorder, recurrent, moderate and agoraphobia with panic disorder.  (Tr. 503.)  CNP Miller increased Mr. McIlvain's Wellbutrin, and started him on Vraylar and lorazepam.  (Tr. 504.)

On August 4, 2022, Mr. McIlvain returned to CNP Miller for medication management. (Tr. 507-10.)  He reported no improvement in his sleep or mood with Vraylar, and he reported dizziness, headaches, and overstimulation with the increased dose of Wellbutrin.  (Tr. 507.) CNP Miller reminded Mr. McIlvain that it would take time for him to feel the effects of Vraylar. (*Id*.)  He reported that he had only taken lorazepam once, but he felt it was effective.  (*Id*.)  He continued to rate his depression as moderate in severity and denied suicidal ideation.  (*Id*.)  He said his sleep was poor and he had racing thoughts.  (*Id*.)  He rated his anxiety as moderate and said it worsened in social situations.  (*Id*.)  CNP Miller noted that Mr. McIlvain was more talkative during the appointment and stood up for himself when his mother was trying to talk over him.  (*Id*.)  He reported he was working on his relationship with his fiancée and had been

11

sticking up for himself.  (*Id*.)  Mental status examination findings were unremarkable.  (Tr. 508.)  CNP Miller adjusted Mr. McIlvain's prescriptions for Wellbutrin, Vraylar, and lorazepam, and she added doxepin for insomnia.  (Tr. 508, 509.)

On September 14, 2022, Mr. McIlvain returned to APRN Gooch.  (Tr. 569-72.)  He reported that he recently started new medication for a diagnosis of bipolar disorder and the medication was helping.  (Tr. 571.)  He continued to report anxiety.  (*Id*.)  On examination, his insight and judgment were good, his mood and affect were normal, he was active and alert, and he was oriented to time, place, and person.  (*Id*.)  APRN Gooch noted that Mr. McIlvain was responding well to his new medication for bipolar disorder and that his agoraphobia was improving.  (Tr. 472.)  APRN Gooch recommended that Mr. McIlvain continue with his current regimen and continue to follow up with psychiatry.  (*Id*.)

On September 27, 2022, Mr. McIlvain returned to CNP Miller.  (Tr. 526-29.)  He reported he was "doing well," and his relationship with his fiancée had improved significantly after he stood up for himself and they started communicating with each other.  (Tr. 526.)  Mental status examination findings were unremarkable.  (Tr. 527.)  Mr. McIlvain did not feel that Vraylar and propranolol were working and those medications were discontinued.  (Tr. 526-27.)  CNP Miller continued Mr. McIlvain's prescription for Wellbutrin and adjusted his doxepin and lorazepam prescriptions.  (Tr. 527.)

On November 7, 2022, Mr. McIlvain returned to CNP Miller, reporting that things were "going well."  (Tr. 530.)  He reported that doxepin 35 mg was not helping but 50 mg was too sedating.  (*Id*.)  He felt that the Ativan (lorazepam) was helping him manage his severe anxiety, relax before bed, and sleep.  (*Id*.)  He rated his depression as mild in severity.  (*Id*.)  He denied suicidal ideation and episodes of mania and/or psychosis.  (*Id*.)  He said his relationship with his

fiancée was continuing to improve.  (*Id.*)  His mental status examination was unremarkable.  (Tr. 531.)  CNP Miller discontinued doxepin, continued Wellbutrin, and increased lorazepam.  (*Id.*)

Mr. McIlvain returned to CNP Miller on February 6, 2023, for a telehealth appointment. (Tr. 534-36.)  He again reported that things were "going well," but he noted that he was recently denied disability and felt discouraged.  (Tr. 534.)  He continued to report that Ativan was helping him manage his severe anxiety and helping him sleep.  (*Id.*)  He continued to rate his depression as mild in severity and he denied suicidal ideation and episodes of mania and/or psychosis.  (Tr. 534-35.)  He said that his relationship with his fiancée continued to improve.  (Tr. 534.)  His mental status examination was unremarkable.  (Tr. 535.)  CNP Miller continued Mr. McIlvain's prescriptions for Wellbutrin and lorazepam.  (*Id.*)

When Mr. McIlvain retuned to CNP Miller on March 30, 2023, his diagnoses included: cyclothymic disorder; agoraphobia with panic disorder; post-traumatic stress disorder, chronic; and major depressive disorder, recurrent, moderate.  (Tr. 537.)  He reported that things were "going well" and he was tolerating his medications without side effects.  (Tr. 537.)  He said his anxiety and depression were stable, with Ativan helping him manage his severe anxiety and sleep.  (*Id.*)  His relationship with his fiancée continued to improve and he denied any episodes of mania and/or psychosis.  (*Id.*)  His mental status examination was unremarkable. (Tr. 538.) CNP Miller continued Mr. McIlvain's prescriptions for Wellbutrin and lorazepam.  (*Id.*)

On April 4, 2023, Mr. McIlvain presented to LSW Weatherspoon for counseling.  (Tr. 577-78.)  His mood was described as "anxious, euthymic." (Tr. 577.)  He had a constricted affect with no suicidal or homicidal ideation.  (*Id.*)  LSW Weatherspoon noted that Mr. McIlvain's high anxiety was a barrier to his progress.  (*Id.*)  She indicated that his progress was "stable," noting that he reported he was "maintaining and not getting worse."  (Tr. 578.)

13

On April 5, 2023, Mr. McIlvain returned to APRN Gooch for management of his medical conditions.  (Tr. 565-68.)  His psychiatric examination was unremarkable and his mental health conditions were noted to be chronic but stable on the current psychiatric regimen.  (Tr. 567.)  Mr. McIlvain's depression screening was negative.  (*Id*.)

On May 23, 2023, Mr. McIlvain returned to LSW Weatherspoon for counseling.  (Tr. 579-80.)  He rated his anxiety a 3-4 out of 10 with 10 being the highest.  (Tr. 579.)  They discussed Mr. McIlvain's obsessive compulsive issues with pulling his hair and pacing.  (*Id*.)  They discussed adding an exercise plan to his daily routine.  (*Id*.)  Mr. McIlvain presented with an anxious mood and a full range affect.  (Tr. 580.)  LSW Weatherspoon continued to note that Mr. McIlvain's high anxiety was a barrier to his progress.  (*Id*.)  She indicated that his progress was "slow," noting there was some improvement in his mood.  (*Id*.)

On May 24, 2023, Mr. McIlvain returned to CNP Miller.  (Tr. 574-76.)  Mr. McIlvain reported that his depression and anxiety were stable.  (Tr. 574.)  He continued to report that the Ativan was helping with his severe anxiety and sleep.  (*Id*.)  He said he took a half a tablet at bedtime and full tablet before social outings or doctor appointments.  (*Id*.)  He said his relationship with his fiancée continued to improve and he continued to care for his son.  (*Id*.)  He denied episodes of mania and/or psychosis.  (*Id*.)  Mr. McIlvain's mental status examination was unremarkable.  (Tr. 575.)  CNP Miller continued Mr. McIlvain's prescriptions for Wellbutrin and lorazepam.  (*Id*.)

On September 12, 2023, Mr. McIlvain returned to CNP Miller for a telehealth medication management appointment.  (Tr. 587-90.)  He reported that he had been struggling, noting he was having issues adjusting since his son had started pre-school.  (Tr. 587.)  He said his depression and anxiety had increased, and his sleep was poor.  (*Id*.)  He was tolerating his medications

without side effects, and said Ativan was continuing to help him manage his severe anxiety and sleep, but he felt he might be building up a tolerance.  (*Id*.)  He reported that he continued to care for his son and his relationship with his fiancée continued to improve.  (Tr. 588.)  He said he had been dismissed from counseling and was upset about it.  (*Id*.)  His mother said she called about it and was waiting for a return call.  (*Id*.)  Mr. McIlvain's mental status examination was unremarkable.  (*Id*.)  CNP Miller continued Mr. McIlvain's prescriptions for Wellbutrin and lorazepam and added Trintellix and trazodone.  (*Id*.)

On October 9, 2023, Mr. McIlvain returned to APRN Gooch for follow up.  (Tr. 598-601.)  He reported his anxiety and depression were at manageable levels.  (Tr. 600.)  His psychiatric examination was unremarkable and his mental health conditions were noted to be chronic but stable on the current psychiatric regimen.  (Tr. 601.)

Mr. McIlvain returned to CNP Miller on December 4, 2023.  (Tr. 617-20.)  He reported he was tolerating his medications, except he had been having nausea with Trintellix and was going to switch to taking that medication at bedtime.  (Tr. 617.)  He continued to report that Ativan was helping manage his severe anxiety and sleep.  (*Id*.)  He also continued to report improvement in his relationship with his fiancée and that he cared for his son.  (Tr. 618.)  Mr. McIlvain's mental status examination was again unremarkable.  (*Id*.)  CNP Miller continued Mr. McIlvain's prescriptions.[3]  (*Id*.)

---

[3] In his Brief, Plaintiff cites to records from visits with CNP Miller on January 23, 2024, and March 20, 2024, noting that this evidence was submitted after the hearing.  (ECF Doc. 7, p. 4 (citing Tr. 43-44, 48).)  While this evidence was submitted to the Appeals Council (Tr. 2), it was not before the ALJ and therefore will not be considered.  *See Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001) (explaining that "evidence submitted to the Appeals Council after the ALJ's decision cannot be considered part of the record for purposes of substantial evidence review").

### 2.      Opinion Evidence

#### i.      Treating Sources

##### a.      Matthew Gooch, APRN

On November 16, 2020, prior to the alleged onset date, Matthew Gooch, APRN,
completed a behavioral health statement for Prudential Group Disability Insurance (Tr. 371-73),
indicating he first saw Mr. McIlvain on November 30, 2015, and last saw him on November 9,
2020 (Tr. 372).  APRN Gooch recommended that Mr. McIlvain be off work starting on
November 9, 2020, with a return-to-work target date of February 1, 2021, due to deteriorating
mental health.  (Tr. 371-72.)  APRN Gooch indicated that Mr. McIlvain had a diagnosis of mixed
anxiety and depression disorder with mental status examination findings of anhedonia, emotional
lability, and irritability, and subjective symptoms of fatigue, insomnia, and crying.  (*Id.*)  When
asked to describe Mr. McIlvain's limitations or restrictions, APRN Gooch stated "unable to
concentrate for [more than] 5 minutes – temporary."  (Tr. 371.)  He was prescribed Vistaril and
Wellbutrin with his treatment goal being to improve his depression and anxiety.  (Tr. 372.)

##### b.      Kristin Miller, APRN, PMHNP BC

In March 2023, CNP Miller completed a Mental Impairment Questionnaire (Listings).
(Tr. 28, 603-05.)  She reported that she first met Mr. McIlvain on July 14, 2022, and saw him
every three months.  (Tr. 603.)  She indicated that Mr. McIlvain's course of treatment consisted
of medication management.  (*Id.*)  She reported that his prescriptions included Wellbutrin and
Ativan, and he was responding well to the medications, but she noted side effects of dizziness,
cognitive dulling, confusion, drowsiness, and insomnia.  (*Id.*)  When asked to describe the
clinical findings, including the results of mental status examinations, that demonstrated the
severity of Mr. McIlvain's mental impairment and symptoms, CNP Miller stated: "mood

16

disturbance, irrational anxiety, social phobia leading to increased / unmanageable levels of anxiety, mood instability (hypomania / depression) [and] poor sleep." (*Id*.) She opined that Mr. McIlvain's prognosis was fair, indicating he would "likely require lifelong treatment." (*Id*.)

CNP Miller used a check-box form to identify the following signs and symptoms: appetite disturbance with weight change; generalized persistent anxiety; mood disturbance; recurrent and intrusive recollections of a traumatic experience, which are a source of marked distress; persistent disturbances of mood or affect; cyclothymic disorder; perceptual or thinking disturbances; sleep disturbance; and recurrent severe panic attacks manifested by a sudden unpredictable onset of intense apprehension, fear, terror and sense of impending doom occurring on the average of at least once a week. (Tr. 604.) CNP Miller also used a check-box form to rate the degree to which functional limitations existed as a result of Mr. McIlvain's mental impairments. (Tr. 605.) She opined Mr. McIlvain had: moderate limitations in his ability to understand, remember, or apply information; marked limitations in maintaining concentration, persistence, or pace and in adapting or managing oneself; and extreme limitations in interacting with others. (*Id*.) She also checked a box indicating that Mr. McIlvain had a history of one or more years' inability to function outside a highly supportive living arrangement with an indication of continued need for such an arrangement. (*Id*.) Finally, she opined that Mr. McIlvain would be absent from work "five days," stating she did not feel he could function in the workforce due to symptoms of cyclothymia and agoraphobia. (*Id*.)

### ii.     Consultative Examiner

On December 10, 2022, Mr. McIlvain presented to Karolis Bauza, M.D., at EverMed Exams for an internal medicine consultative examination. (Tr. 512-522.) Mr. McIlvain's mother accompanied him to the examination. (Tr. 512.) He reported a history osteoarthritis, bipolar

17

disorder, agoraphobia, and severe social anxiety.  (Tr. 512-13.)  On examination, Mr. McIlvain was alert with good eye contact, fluent speech, clear thought processes, normal memory, good concentration, and he was oriented to time, place, person, and situation, but he appeared withdrawn and somewhat frustrated.  (Tr. 515, 516.)  It was noted that his mother was present and did most of the talking.  (*Id*.)  Dr. Bauza's impression was osteoarthritis, multiple knee surgeries for dislocations, bipolar disorder, and agoraphobia.  (Tr. 516.)  Dr. Bauza opined that Mr. McIlvain had no manipulative or communicative limitations, but he had some exertional, postural, and visual limitations.  (Tr. 517.)  Dr. Bauza also opined that Mr. McIlvain would have unspecified "workplace environmental limitations due to agoraphobia."  (*Id*.)

### iii.    State Agency Psychological Consultants

On September 11, 2022, state agency psychological consultant Aracelis Rivera, Psy. D., completed a Psychiatric Review Technique ("PRT") (Tr. 91-92, 101-02) and Mental RFC Assessment (Tr. 94-95, 104-05).  In the PRT, Dr. Rivera opined that Mr. McIlvain's impairments did not meet or equal Listings 12.04, 12.06, or 12.08.  (Tr. 91, 101.)  Dr. Rivera also opined that Mr. McIlvain had no limitations in his ability to understand, remember, or apply information, and moderate limitations in his ability to: interact with others; maintain concentration, persistence, or pace; and adapt or manage himself.  (*Id*.)  In the Mental RFC Assessment, Dr. Rivera opined that Mr. McIlvain was capable of understanding and remembering simple work instructions in a setting that did not have fast pace demand and where he could work away from others; he was susceptible to misinterpreting interpersonal nuance, yet he could relate adequately on a superficial basis in an environment that entailed infrequent contact, minimal interaction with coworkers, and no over-the-shoulder scrutiny; and he was capable of working in an environment with infrequent changes.  (Tr. 94-95, 104-05.)

On July 17, 2023, state agency psychological consultant Sheri Tomak, completed a PRT (Tr. 110-12, 122-24) and Mental RFC Assessment (Tr. 115-17, 127-29), affirming the Dr. Rivera's opinions.

### C.     Plaintiff's Function Report and Hearing Testimony

#### 1.     Plaintiff's Function Report

On August 8, 2022, Mr. McIlvain completed a Function Report. (Tr. 272-80.)  He stated he was unable to go to work because he had severe panic attacks when he had to go to work. (Tr. 272.)  He also had "major social anxiety" and depression that prevented him from doing daily activities and communicating with coworkers and supervisors. (*Id*.)  He took care of his autistic son, but his fiancée and mom helped a lot with his son when he had really bad days. (Tr. 274.)  He did not always take care of himself and sometimes his mother and fiancée had to remind him to. (Tr. 275.)  When he went out, he had to have someone with him. (Tr. 276, 277.)  If he tried to go out alone, he had a panic attack. (Tr. 276.)  Aside from his immediate family, he did not socialize. (Tr. 277.)  He even struggled being at functions with immediate family. (*Id*.)  He reported that his mood affected those close to him and how he got along with others. (Tr. 278.)  He also reported trouble concentrating and said he had to have instructions repeated. (*Id*.)

#### 2.     Plaintiff's Hearing Testimony

Mr. McIlvain testified in response to questioning by the ALJ and his counsel at a telephonic hearing on January 22, 2024. (Tr. 58-79, 83.)  Mr. McIlvain testified that one of the most significant ways in which his mental impairments limited him was in the area of social interaction. (Tr. 68.)  He said it was extremely difficult for him to be around people and have conversations with them. (*Id*.)  He said it was "borderline impossible" for him to make eye contact with people. (Tr. 79.)  He said it was very difficult for him to make it to his attorney's

office that day for the hearing.  (Tr. 68-69.)  He had to take a double dose of his Ativan in order to make it to his attorney's office for the hearing.  (Tr. 77.)

When he was employed, there was always a member of his family working with him. (Tr. 77.)  He felt the issues he had with social interaction had gotten worse since he left his last job.  (Tr. 69.)  There were times that he had panic-type reactions when he had to be around people.  (*Id*.)  He had chest tightness, heavy breathing "straight from [his] mouth," and constant twitching in his eyes.  (*Id*.)  To calm himself down, he had to "[j]ust kind of go to the safe zone," a place more isolated with others.  (*Id*.)  While he spent time with family members, there were times he had to medicate himself if he had to attend a family gathering.  (Tr. 70-71.)  He could go to the store for a couple of things or run an errand if he had someone with him.  (Tr. 73.)  He usually instructed food delivery people to leave the food at the door because it was too difficult for him to answer the door for a delivery person.  (Tr. 77-78.)  There were days when he did not want to get out of bed in the morning, talk to anyone, or do anything.  (Tr. 70.)

Mr. McIlvain said there were people, places, or situations he tried to avoid due to past traumas.  (Tr. 71.)  When in public, he felt like he was looking over his shoulder all the time and was nervous about his surroundings.  (Tr. 72.)  He rated his sleep 50/50, explaining that he was sometimes able to sleep okay, but at other times could not sleep at all.  (*Id*.)  If he had something going on that he was nervous about, he was not be able to sleep at all.  (*Id*.)  For instance, he was so nervous about his hearing that he had not slept since 10:00 a.m. the day before.  (*Id*.)  When he was in a depressed state, he did not manage his personal hygiene well, but he did continue to take care of things at home for his son who was five years old.  (Tr. 72-73.)  Mr. McIlvain said he participated in counseling in the past, but he was not in counseling at the time of the hearing. (Tr. 71.)  He said it had been difficult for him to go to counseling because he did not feel any

different after going and he cancelled a lot because the thought of going "got [him] worked up."
(*Id.*)  Ultimately, his counselor "dropped" him for cancelling.  (*Id.*)

During the day, Mr. McIlvain "stay[ed] cooped up in [his] apartment with [his] son."
(Tr. 73.)  When they were at home, Mr. McIlvain played with his son and tried to help him with
things he was learning in pre-school.  (*Id.*)  His son attended pre-school three days a week for
three hours each day.  (Tr. 73-74.)  Mr. McIlvain usually got his son ready for school, but he
could not take him to school because he had to interact with staff, and he was "afraid to speak to
. . . [them] for three seconds."  (Tr. 74.)  He also felt it was a "separation thing" that made it hard
for him to drop his son off.  (*Id.*)  His fiancée would leave work to take his son to school because
Mr. McIlvain was not able to it.  (*Id.*)  There were some days when he could not even handle
getting his son ready for school.  (*Id.*)  On those days, he would see if his mom could come over
to help or he would head over to his mom's house, which was only five minutes away.  (Tr. 74-
75.)  At times, Mr. McIlvain helped his mom with his special needs sister, sitting with her to
make sure she did not hurt herself.  (Tr. 75.)

Mr. McIlvain said thinking about his inability to help his fiancée financially caused him
to have bad days to the point of not being able to watch his son.  (Tr. 75.)  He also said he was
easily distracted at times, had difficulty focusing and concentrating (Tr. 70), had racing thoughts,
and paced all the time (Tr. 75).  He used fidgets, like bubble pops and stress balls.  (Tr. 75-76.)
But he also said he picked at his nails until they were down to "the nubs" and pulled his hair out
from his beard and other parts of his body.  (Tr. 76.)

## D.    Vocational Expert's Testimony

A Vocational Expert ("VE") classified Mr. McIlvain's past work as: production
assembler, an SVP 2, light level job; sawblade sharpener, an SVP 4, light level job; and saw

operator, an SVP 3, medium level job.  (Tr. 80-81.)  The VE testified that an individual of Mr. McIlvain's age, education, and work experience, with the functional limitations described in the ALJ's RFC (Tr. 24, 81), could not perform Mr. McIlvain's past work but could perform jobs in the national economy, like housekeeping cleaner, mail clerk, and office helper.  (Tr. 81-82.)

### III.    Standard for Disability

Under the Social Security Act, 42 U.S.C. § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).

> An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[.]

42 U.S.C. § 423(d)(2)(A).

To make a determination of disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations, summarized as follows:

1.    If the claimant is doing substantial gainful activity, he is not disabled.

2.    If the claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3.    If the claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, the claimant is presumed disabled without further inquiry.

4.    If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if the claimant's impairment prevents him from doing past relevant work.  If the claimant's impairment does not prevent him from doing his past relevant

work, he is not disabled.

5.      If the claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. § 404.1520; § 416.920[4] *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987).

Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.

*See Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the

Commissioner at Step Five to establish whether the claimant has the Residual Functional

Capacity ("RFC") and vocational factors to perform other work available in the national

economy.  *Id.*

## IV.     The ALJ's Decision

In his March 4, 2024 decision, the ALJ made the following findings:[5]

1.      The claimant meets the insured status requirements of the Social Security Act through December 31, 2024.  (Tr. 20.)

2.      The claimant has not engaged in substantial gainful activity since April 15, 2021, the alleged onset date. (*Id*.)

3.      The claimant has had the following severe impairments: obesity, status post right knee proximal realignment and lateral retinacular release, left knee patellofemoral dislocation and medial patellofemoral ligament tear, major depressive disorder, generalized anxiety disorder, social anxiety disorder, bipolar disorder, agoraphobia, and post-traumatic stress disorder. (Tr. 20-21.)

4.      The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (Tr. 21-24.)

---

[4] The DIB and SSI regulations cited herein are generally identical.  Accordingly, for convenience, in most instances, citations to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20 C.F.R. § 404.1501 et seq.  The analogous SSI regulations are found at 20 C.F.R. § 416.901 et seq., corresponding to the last two digits of the DIB cite (i.e., 20 C.F.R. § 404.1520 corresponds with 20 C.F.R. § 416.920).

[5] The ALJ's findings are summarized.

5.     The claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except he could occasionally climb ramps and stairs but could never climb ladders, ropes, or scaffolds; he could occasionally kneel, crouch, and crawl; he could have occasional exposure to unprotected heights and hazardous machinery; he is limited to simple routine tasks and simple work-related decisions; he is limited to occasional and superficial interactions with supervisors, coworkers, and the general public; and he could tolerate few changes in a routine work setting.  (Tr. 24-30.)

6.     The claimant is unable to perform any past relevant work.  (Tr. 30-31.)

7.     The claimant was born in 1993 and was 27 years old, defined as a younger individual age 18-49, on the alleged disability onset date.  (Tr. 31.)

8.     The claimant has at least a high school education.  (*Id*.)

9.     Transferability of job skills is not material to the determination of disability.  (*Id*.)

10.    Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in the national economy that the claimant could perform, including housekeeping cleaner, mail clerk, and office helper.  (Tr. 31-32.)

Based on the foregoing, the ALJ found Mr. McIlvain had not been under a disability, as defined in the Social Security Act, from April 15, 2021, through the date of the decision.  (Tr. 32.)

## V.     Plaintiff's Arguments

Mr. McIlvain presents two assignments of error.  First, he argues the ALJ erred in his analysis of treating source medical opinions when he failed to discuss the supportability and consistency of the opinions and to support his conclusions.  (ECF Doc. 7, pp. 1, 8-15.)  Second, he argues the ALJ erred at Step Three when he failed to analyze Plaintiff's mental impairments in conjunction with Listing 12.06 (anxiety and obsessive-compulsive disorders), and failed to find that Plaintiff satisfied the criteria for Listing 12.06.  (*Id*. at pp. 1, 15-22.)

# VI.    Law & Analysis

## A.    Standard of Review

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  *See Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 405 (6th Cir. 2009) ("Our review of the ALJ's decision is limited to whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence.").

When assessing whether there is substantial evidence to support the ALJ's decision, the Court may consider evidence not referenced by the ALJ.  *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Hum. Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Hum. Servs.*, 889 F.2d 679, 681 (6th Cir. 1989)).  The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)).  "'The substantial-evidence standard . . . presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts.'" *Blakley*, 581 F.3d at 406 (quoting *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)).  Therefore, a court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).  Even if substantial evidence supports a claimant's position, a reviewing court cannot overturn the

Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

Although an ALJ decision may be supported by substantial evidence, the Sixth Circuit has explained that the "'decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007) (citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546–547 (6th Cir. 2004))).  A decision will also not be upheld where the Commissioner's reasoning does not "build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)).

**B.     First Assignment of Error: The ALJ Did Not Err in Evaluating the Persuasiveness of the Medical Opinions**

Mr. McIlvain asserts in his first assignment of error that the ALJ erred in evaluating the medical opinions of his "treating sources" (ECF Doc. 7, pp. 1, 8) but addresses only one treating source opinion (*id.* at pp. 11-12) before turning to the non-treating opinions of the physical consultative examiner and state agency psychological consultants (*id.* at pp. 12-15).  His purpose in discussing the non-treating opinions is unclear.  He prefaces his discussion of those opinions by asserting that "[a]dditional evidence supported [CNP Miller's] treating source opinion" (*id.* at p. 12), suggesting the opinions are offered as evidence that conflicts with the ALJ's findings as to CNP Miller's opinion.  But Plaintiff also challenges the ALJ's analysis of the non-treating

opinions.  (*Id.* at pp. 13-15.)  Giving Plaintiff the benefit of the doubt, the undersigned will

address his arguments as to all three medical opinions, discussing each opinion in turn.[6]

### 1.    Framework for Evaluation of Medical Opinion Evidence

The Social Security Administration's ("SSA") regulations for evaluating medical opinion

evidence require ALJs to evaluate the "persuasiveness" of medical opinions "using the factors

listed in paragraphs (c)(1) through (c)(5)" of the regulation.  20 C.F.R. § 404.1520c(a); *see Jones*

*v. Comm'r of Soc. Sec.*, No. 3:19-CV-01102, 2020 WL 1703735, at \*2 (N.D. Ohio Apr. 8, 2020).

The five factors to be considered are supportability, consistency, relationship with the claimant,

specialization, and other factors.  20 C.F.R. §§ 404.1520c(c)(1)-(5).  The most important factors

are supportability and consistency.  20 C.F.R. §§ 404.1520c(a), 404.1520c(b)(2).  ALJs must

explain how they considered consistency and supportability, but need not explain how they

considered the other factors.  20 C.F.R. § 404.1520c(b)(2).

As to supportability, the regulations state: "The more relevant the objective medical

evidence and supporting explanations presented by a medical source are to support his or her

medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical

opinions or prior administrative medical finding(s) will be."  20 C.F.R. § 404.1520c(c)(1).  In

other words, "supportability" is the extent to which a medical source's own objective findings

and supporting explanations substantiate or support the findings in the opinion.

As to consistency, the regulations state: "The more consistent a medical opinion(s) or

prior administrative medical finding(s) is with the evidence from other medical sources and

nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior

---

[6] Plaintiff's counsel is cautioned that future filings must follow the instructions in this Court's briefing order by "setting forth each issue presented for decision by the Court" and providing a legal analysis that contains "specific arguments in support of each issue presented."  (ECF Doc. 4, p. 2 (emphasis added).)  Legal issues that are not both clearly identified in the assignment of error and clearly developed in the legal argument may be deemed waived.

administrative medical finding(s) will be." 20 C.F.R. § 404.1520c(c)(2). In other words, "consistency" is the extent to which a medical source's opinion findings are consistent with the evidence from other medical and nonmedical sources in the record.

In reviewing an ALJ's medical opinion analysis, courts must consider whether the ALJ: considered the full record in assessing the persuasiveness of the opinion; appropriately articulated his reasons for finding the opinion unpersuasive; and made findings supported by substantial evidence. *See* 20 C.F.R. § 404.1520c (governing how ALJs consider and articulate findings re: medical opinions); 20 C.F.R. § 404.1520(e) (findings re: RFCs will be "based on all the relevant medical and other evidence" in the case record); *see also Blakley*, 581 F.3d at 405.

### 2. The ALJ Adequately Evaluated CNP Miller's Opinion

In challenging the ALJ's finding that the opinion of treating provider CNP Miller was not persuasive, Mr. McIlvain asserts that the ALJ's "brief conclusion failed to provide support for or establish consistency with the remainder of the evidence in this matter." (ECF Doc. 7, pp. 11-12.) He also highlights certain subjective complaints and argues that those complaints were "consistent with" CNP Miller's opinion. (*Id.*) The Commissioner argues in response that "the ALJ gave an exceptionally detailed explanation" of his supportability and consistency findings, and that those findings were supported by substantial evidence. (ECF Doc. 8, pp. 9-12.)

The ALJ analyzed the persuasiveness of CNP Miller's medical opinion as follows:

In March 2023, Nurse Miller provided an assessment based on medication visits since mid-2022. Although she described the claimant as stable with normal mental status exams and no side effects before and after this assessment, Nurse Miller offered serious and disproportionate opinions regarding his functioning. She noted that the claimant was "responding well" to medications, but had side effects including dizziness, cognitive dulling, confusion, drowsiness, and insomnia. However, she noted no side effects at the visit in the same month as this assessment, as described above. She noted several symptoms. Nurse Miller used a check-box form to indicate several symptoms. She again used a check-box form to endorse moderate limits in understanding, remembering or applying information, which is

28

not consistent with her indication of normal intellectual functioning and her mental status exams which reflect normal memory and otherwise normal findings as cited throughout this decision. She endorsed extreme limitation in social interaction, which is wholly inconsistent with his ability to get along with multiple treating sources, good family relationships, a long-term romantic relationship, and being the parent who cares for a young child while his girlfriend is at work. She endorsed marked limitation in concentration, persistence and pace, but this is contradicted by her normal mental status exams at nearly all medication visits. She endorsed marked limitation in adaptation, but the claimant performs normal daily tasks, adjusts to seeing new medical sources, and has no history of emergency mental health care. She opined he is unable to function outside of a highly supportive living arrangement, yet he has never been an inpatient and he cares for not only himself, but also for his young autistic son. Nurse Miller then opined, "I do not feel the client would be able to function within the workforce due to symptoms of cyclothymia and agoraphobia." The undersigned notes that the claimant has attended treatment. He stated he can go in a store with another person. He went camping, and reported he enjoys being outdoors hunting and fishing. This evidence is not consistent with disabling agoraphobia. Further, depression was mild and stable with medication, which contradicts disabling cyclothymia. This source opined the claimant would miss more than 4 days of work per month, but provided no supporting explanation. She felt the claimant could manage his own benefits, despite suggesting marked concentration deficits in the same assessment. (16F) This assessment is not well supported, and it is inconsistent with this same source's notes of normal mental status exams as cited throughout this decision, good response to medication, no side effects of ongoing medications (although some were discontinued for side effects), and the ability to perform a wide array of activities. For these reasons, the opinion is not persuasive.

(Tr. 28 (emphasis added).)  Both before and after this detailed analysis, as referenced directly in the analysis, the ALJ also provided a thorough summary of Plaintiff's mental health treatment records from both CNP Miller and other providers.  (*See* Tr. 25-29.)

In the context of this detailed analysis, the undersigned can find no support for Mr. McIlvain's broad, generalized assertion that the ALJ's "brief conclusion failed to provide support for or establish consistency with the remainder of the evidence in this matter."  (ECF Doc. 7, p. 12.)  The ALJ provided a detailed discussion of both supportability (the extent to which CNP Miller's objective findings and explanations supported her opinion) and consistency (the extent to which the opinion is consistent with evidence from other medical and nonmedical

sources) in which the ALJ directly referenced his prior, thorough discussion of the evidence.  Mr. McIlvain has not identified misstatements in the ALJ's findings or material evidence that the ALJ failed to account for in his analysis.  Thus, Mr. McIlvain has not met his burden to show that the ALJ's findings regarding the opinion lacked the support of substantial evidence.

Mr. McIlvain's additional assertion that his own subjective complaints were consistent with CNP Miller's opinion (ECF Doc. 7, p. 12) does not impact this analysis.  Even if Mr. McIlvain can present substantial evidence to support a finding that CNP Miller's opinion is persuasive, this Court cannot overturn the ALJ's finding to the contrary "so long as substantial evidence also supports the conclusion reached by the ALJ."  *Jones*, 336 F.3d at 477.  As Mr. McIlvain acknowledges, the ALJ's decision reflects that he considered Mr. McIlvain's subjective reports regarding his symptoms.  (*See* ECF Doc. 7, p. 12 (citing Tr. 26-27); *see also* Tr. 23, 24.)  The ALJ then explained that he found Mr. McIlvain's subjective complaints were "not entirely consistent with the medical evidence and other evidence in the record" (Tr. 23) and provided a detailed discussion of how he considered the medical and non-medical evidence in finding CNP Miller's opinion "not persuasive" (Tr. 28).  The ALJ adequately articulated the evidentiary basis for his findings, and his findings were supported by substantial evidence.

To the extent Mr. McIlvain also intends to argue that the medical opinions of the physical consultative examiner and/or the state agency psychological consultants supported CNP Miller's medical opinion (*see* ECF Doc. 7, pp. 12-15), the ALJ clearly explained why he found the opinion of consultative examiner Dr. Bauza "not persuasive or supportable" (Tr. 25) and why he found the psychological consultants' opinions "mostly persuasive" but adopted a somewhat different mental functional capacity (Tr. 29-30).  Mr. McIlvain has not identified any part of

those separate opinions or the ALJ's analysis of those opinions that would deprive the ALJ of substantial evidence to support his findings as to CNP Miller's treating opinion.[7]

Having reviewed the ALJ decision as a whole, the undersigned concludes that the ALJ articulated the basis for his persuasiveness findings in a manner that adequately explained how he considered the factors of "consistency" and "supportability," and that Mr. McIlvain has not shown that the ALJ's explanations or findings lack the support of substantial evidence.

### 3.    ALJ Adequately Evaluated Dr. Bauza's Opinion

Mr. McIlvain also challenges the ALJ's finding that consultative examiner Dr. Bauza's opinion that "[t]here are . . . workplace environmental limitations due to agoraphobia" was not persuasive or supportable (Tr. 25 (citing Tr. 511-24)), arguing that the ALJ's finding "was neither supported by nor consistent with any other evidence in the record."  (ECF Doc. 7, p. 13.) The Commissioner responds that "the ALJ thoroughly explained why he found the opinion unsupported and inconsistent with the evidence."  (ECF Doc. 8, p. 12.)

The ALJ analyzed the persuasiveness of Dr. Bauza's medical opinion as follows:

Based on the December 2022 consultative exam described above, Dr. Bauza provided an assessment. He opined, "The claimant has no limitations with sitting. The claimant has moderate limitations with standing and walking due to bilateral knee pain. The claimant does not need an assistive device with regard to short and long distances and uneven terrain. The claimant has moderate limitations with lifting and carrying weight due to bilateral knee pain. There are limitations with bending, stooping, crouching and squatting and the claimant will not be able to perform these due to bilateral knee pain. There are no limitations on reaching, grasping, handling, fingering and feeling. There are no relevant communicative limitations. There are relevant visual limitations due to need for corrective lenses and workplace environmental limitations due to agoraphobia." [] This assessment is not persuasive or supportable, because the suggested limits are not consistent with the normal imaging and mostly normal clinical exam. "Moderate" limitations are not defined in terms of time during an eight hour workday or frequency such as frequent, occasional, etc. This provider specifically indicated there were no gait issues, and he documented normal strength, sensation, range of motion and reflexes,

---

[7] As discussed in Sections VI.B.3. and VI.B.4., *infra*, the undersigned also finds no error in the ALJ's analysis of the medical opinions of Dr. Bauza or the state agency psychological consultants.

which is not consistent with any significant standing/walking limits. The claimant was able to perform all postural tasks requested without any acute distress, which contradicts being unable to perform postural movements. This source did not conduct an eye exam. The claimant does not allege any visual limits. The suggestion of unspecified visual limits is not supported by the mere use of corrective lenses. This source is not a mental provider, nor did he conduct a mental exam. His suggestion for unspecified limits due to agoraphobia are based wholly on subjective complaints, which were not evaluated on this exam as they were outside the scope of the physical evaluation.

(Tr. 25 (citation omitted) (emphasis added).)

In challenging the ALJ's findings regarding Dr. Bauza's opinion that "[t]here are . . . workplace environmental limitations due to agoraphobia," Mr. McIlvain argues that "Dr. Bauza is a physician who made recommendations based on his examination and observations of Plaintiff" and whose "opinion was based on medical knowledge regarding the totality of Plaintiff's observed limitations."  (ECF Doc. 7, p. 13.)  But the ALJ acknowledged Dr. Bauza's clinical findings while explicitly discounting his opinion as to agoraphobia because he "is not a mental provider, nor did he conduct a mental exam."  (Tr. 25.)  The ALJ also concluded that the opinion as to agoraphobia was "based wholly on subjective complaints" that were "outside the scope of the physical evaluation" (Tr. 25), a finding that is supported by Dr. Bauza's report, which only discusses agoraphobia in the medical history (Tr. 512-13) and notes in the clinical findings simply that Plaintiff "was in no acute distress" and "appeared withdrawn and somewhat frustrated" (Tr. 516-17).  Finally, the ALJ accurately described the opinion as a "suggestion for unspecified limits" (Tr. 25), as Dr. Bauza opines simply that unspecified "environmental limitations" are appropriate (Tr. 517).  Ultimately, the ALJ's analysis of the persuasiveness of Dr. Bauza's opinion was adequately articulated and consistent with the underlying records. Plaintiff's general assertion that Dr. Bauza's opinion is "based on medical knowledge" is inadequate to deprive those findings of the support of substantial evidence.

For the reasons set forth above, the undersigned concludes that the ALJ adequately articulated the basis for his persuasiveness findings with respect to Dr. Bauza's opinion, and further that Plaintiff has not met his burden to show that the ALJ's explanations or findings lacked the support of substantial evidence.

### 4. The ALJ Adequately Evaluated the State Agency Psychological Opinions

Mr. McIlvain also asserts that the ALJ erred when he found the opinions of the state agency psychological consultants "mostly persuasive and supportable" but failed to include their opinion "that Plaintiff would need to work in a setting where he could work away from others" in the mental RFC. (ECF Doc. 7, pp. 13-15 (citing Tr. 29-30).)  He also argues that the ALJ failed to "sufficiently address the supportability and consistency" of those opinions.  (*Id*. at p. 14.)  In response, the Commissioner notes that the ALJ found the state agency opinions "mostly persuasive," was not required to adopt the opinions verbatim, and ultimately adopted mental RFC limitations that were supported by substantial evidence.  (ECF Doc. 8, pp. 12-13.)

The ALJ analyzed the persuasiveness of the state agency opinions as follows:

The State Agency psychological consultants endorsed no limits in understanding, remembering, or applying information, and moderate limits in the three remaining paragraph B criteria. The paragraph C criteria were not met. The claimant is capable of understanding and remembering simple work instructions in a setting that does not have fast-paced demands, where he can work away from others. He is susceptible to misinterpreting interpersonal nuance yet can relate adequately on a superficial basis in an environment that entails infrequent public contact, minimal interaction with coworkers, and no over-the-shoulder supervisor scrutiny. He could adjust to infrequent changes. [] These opinions are mostly persuasive and supportable. The undersigned concurs in the paragraph B and C analysis. However, newer records and testimony support some changes to the specific mental residual functional capacity. Based on the evidence available at the hearing level, the undersigned finds that the claimant could perform work with no more than occasional exposure to unprotected heights and hazardous machinery. The claimant is limited to simple routine tasks and simple work related decisions. He is limited to occasional and superficial interactions with supervisors, coworkers, and the general public. He could tolerate few changes in a routine work setting.

(Tr. 28-29 (citations omitted).)  Prior to making these findings, the ALJ discussed Mr.

McIlvain's mental health treatment records in detail (Tr. 25-29) and explained:

> The claimant has never been psychiatrically hospitalized. He indicated that symptoms were present since high school, but he has sustained work in the past. He did not begin specialized mental health care until after the alleged onset date. Since then, he received conservative care which usually consisted of only medication management and a few counseling visits. Since providers at CommQuest determined the best medication combination, the claimant's condition has been stable with mild symptoms. Mental status exams have been mostly normal with medication. Even at the height of symptoms, the claimant spent his days cooking, cleaning, caring for a young child, and caring for pets. After considering the nature, frequency, and effectiveness of treatment, mental status exams, side effects, and daily activities, the undersigned finds that no more than moderate limits are supported. The claimant has reported sleep and concentration issues. Although exams showed normal memory and no significant concentration deficits, the undersigned finds that he is limited to occasional exposure to unprotected heights and hazardous machinery to maintain safety. The claimant is limited to simple routine tasks and simple work-related decisions. He has reported social anxiety, but he maintains a long-term romantic relationship, cares for his child, has good family relationships, and got along with treating sources. He can shop with another person. The evidence supports a finding that he is limited to occasional and superficial interactions with supervisors, coworkers, and the general public. He has reported reduced coping skills, but he was able to go camping and perform daily household tasks. This evidence supports a finding that he could tolerate few changes in a routine work setting. The evidence does not support any further limits. (3A; 4A)

(Tr. 29 (emphasis added).)

As a general matter, an ALJ "is not required to recite the medical opinion of a physician verbatim in his residual functional capacity finding." *Poe*, 342 F. App'x at 157.  Even where opinions were given "great weight" under the prior regulations, the Sixth Circuit noted that "there [was] no requirement that an ALJ adopt a state agency psychologist's opinions verbatim; nor [was] the ALJ required to adopt the state agency psychologist's limitations wholesale." *Reeves v. Comm'r of Soc. Sec.*, 618 F. App'x 267, 275 (6th Cir. 2015).  Nevertheless, SSR 96-8p requires the ALJ to consider all medical opinions in his RFC assessment and where his assessment "conflicts with an opinion from a medical source," he "must explain why the opinion

was not adopted." SSR 96–8p, *Assessing Residual Functional Capacity in Initial Claims*, 61 Fed.

Reg. 34474, 34478 (July 2, 1996); *see Fleischer*, 774 F. Supp. 2d at 881.

Here, Mr. McIlvain asserts that the ALJ erred when he did not adopt the state agency

consultants' opinion that he can work in a setting "where he can work away from others,"

arguing this is reversible error under *Kinney v. Comm'r of Soc. Sec.*, No. 23-3889, 2024 WL

2273365 (6th Cir. May 20, 2024), where the Sixth Circuit found reversible error when an ALJ

failed to explain why he omitted an RFC limitation as required by SSR 96-8p.  (ECF Doc. 7, pp.

13-14.)  The Commissioner argues that this case is distinguishable from *Kinney* because the ALJ

only found the state agency opinions "mostly persuasive," while the ALJ in *Kinney* found the

relevant opinions persuasive before failing to incorporate limitations without explanation.  (ECF

Doc. 8, pp. 12-13.)  While the Commissioner's observation is true, the undersigned finds the

more important distinction in this case is the fact that the ALJ *did* explain why he failed to adopt

the relevant state agency consultants' limitations, in compliance with SSR 96-8p.

First, the ALJ explained within the opinion analysis that he did not adopt all of the state

agency consultants' opined limitations because "newer records and testimony support some

changes to the specific mental residual functional capacity."  (Tr. 30.)  Second, before making

that finding, the ALJ provided a detailed discussion of Mr. McIlvain's mental health treatment

records (Tr. 25-29) and detailed the considerations that went into his finding that Mr. McIlvain's

mental limitations in interacting with others supported an RFC limitation to "occasional and

superficial interactions with supervisors, coworkers, and the general public," as follows:

- [Plaintiff] did not begin specialized mental health care until after the alleged onset
  date. Since then, he received conservative care which usually consisted of only
  medication management and a few counseling visits.

- Since providers at CommQuest determined the best medication combination, [his] condition has been stable with mild symptoms. Mental status exams have been mostly normal with medication.

- Even at the height of symptoms, [Plaintiff] spent his days cooking, cleaning, caring for a young child, and caring for pets.

- After considering the nature, frequency, and effectiveness of treatment, mental status exams, side effects, and daily activities, the [ALJ] finds that no more than moderate limits are supported.

- [Plaintiff] has reported social anxiety, but he maintains a long-term romantic relationship, cares for his child, has good family relationships, and got along with treating sources. He can shop with another person.

(Tr. 29.)  In this context, the undersigned concludes that the ALJ adequately complied with his obligations under SSR 96-8p to explain why he did not adopt certain limitations set forth in the state agency psychological opinions, including the reference to working a setting "where he can work away from others."  The explanations offered by the ALJ also support a finding that his analysis of the opinions was adequately articulated and supported by substantial evidence.

For the reasons set forth above, the undersigned finds Mr. McIlvain has not met his burden to show that the ALJ failed to comply with his obligations under SSR 96-8p, lacked substantial evidence, or failed to adequately articulate his reasons for adopting a mental RFC that did not include a limitation requiring "work away from others."

Accordingly, the undersigned concludes that the ALJ properly evaluated the relevant medical opinion evidence and Mr. McIlvain's first assignment of error is without merit.

## C.     Second Assignment of Error: The ALJ Adequately Considered Whether Plaintiff's Mental Impairments Satisfied Listing 12.06

In his second assignment of error, Mr. McIlvain argues the ALJ erred at Step Three of the sequential analysis when he assessed the "'B criteria' only for Listings 12.04 and 12.15," while "provid[ing] no analysis of Plaintiff's generalized anxiety disorder, social anxiety disorder, or agoraphobia" under Listing 12.06—anxiety and obsessive-compulsive disorders.  (ECF Doc. 7,

p. 15.)  Plaintiff also challenges the ALJ's finding that he had "none or moderate limitations" in the "B criteria" domains of mental functioning, arguing the ALJ's findings "were incorrect and not supported by the record which established that Plaintiff had extreme difficulty getting along with others along with a marked limitation in his ability to concentrate, persist, and maintain pace and manage himself."  (*Id.* at p. 16.)  In support, he pastes a copy of his earlier, general summary of the mental health treatment records (*id.* at pp. 16-18; *compare id.* at pp. 2-3) and cites to CNP Miller's opinion that he had certain marked and extreme mental limitations (*id.* at p. 18).  In response, the Commissioner argues the burden at Step Three rests with the Plaintiff to prove that he satisfies all elements of a listing, and that substantial evidence supports the ALJ's finding that his impairments did not meet or equal Listing 12.06.  (ECF Doc. 8, pp. 6-9.)

> ### 1.     Framework for Step Three Analysis

At Step Three of the disability evaluation process, a claimant will be found disabled if his impairment meets or equals one of the listings in the Listing of Impairments. 20 C.F.R. § 404.1520(a)(4)(iii).  The claimant bears the burden of establishing that his condition meets or equals a Listing.  *Johnson v. Colvin*, No. 1:13CV-00134-HBB, 2014 WL 1418142, at *3 (W.D. Ky. Apr. 14, 2014) (citing 20 C.F.R. §§ 404.1520(d), 416.920(d); *Buress v. Sec'y of Health and Human Serv's.*, 835 F.2d 139, 140 (6th Cir. 1987)).  That means the claimant "must present specific medical findings that satisfy the various tests listed in the description of the applicable impairment or present medical evidence which describes how the impairment has such equivalency." *Thacker v. Soc. Sec. Admin.*, 93 F. App'x 725, 728 (6th Cir. 2004).

Listing 12.06 pertains to anxiety and obsessive-compulsive disorders.  20 C.F.R. § Pt. 404, Subpt. P, App. 1 § 12.06.  To meet Listing 12.06, a claimant must meet the criteria set forth in paragraph A and the criteria set forth in either paragraph B or paragraph C.  The paragraph B criteria include four areas of mental functioning—understanding, remembering, or applying

information; interacting with others; concentrating, persisting, or maintaining pace; and adapting

or managing oneself—for which a claimant must show extreme limitations in one area or marked

limitations in two areas.  20 C.F.R. § 404.1520a(c)(3), *see also* 20 C.F.R. § Pt. 404, Subpt. P,

App. 1 § 12.06B; 20 C.F.R. § Pt. 404, Subpt. P, App. 1 § 12.00E.  To satisfy paragraph C, a

claimant must have "serious and persistent" mental disorder, meaning a medically documented

history of the mental disorder over a period of at least two years, with evidence of both: medical

treatment, mental health therapy, psychosocial supports, or a highly structured setting that is

ongoing and that diminishes the symptoms and signs of the mental disorder; and marginal

adjustment, meaning minimal capacity to adapt to changes in his environment or to demands that

are not already part of his daily life.  20 C.F.R. § Pt. 404, Subpt. P, App. 1 § 12.06C.

Mr. McIlvain presents two primary arguments in his second assignment of error.  First,

he argues that remand is required because the ALJ did not "analyze any of [his] impairments in

conjunction with Listing 12.06."  (ECF Doc. 7, pp. 15, 21.)  Second, he argues that the ALJ erred

in concluding that he did not satisfy the B or C criteria of Listing 12.06.  (*Id*. at pp. 15-22.)  The

undersigned will address each of these arguments in turn.

### 2.      The ALJ Explicitly Considered Listing 12.06

Despite acknowledging that the ALJ "stated that he considered psychiatric Listings

12.04, *12.06*, and 12.15," Mr. McIlvain argues that the ALJ did not "analyze any of [his]

impairments in conjunction with Listing 12.06" because he "focused on the paragraph 'B' and

'C' criteria for 12.04 and 12.15" without referencing Listing 12.06 in that discussion.  (ECF Doc.

7, p. 15 (citing Tr. 21) (emphasis added).)  This argument is not persuasive.

As Plaintiff acknowledges, the ALJ explicitly stated that he considered "[a]ll of the

listings . . . with specific emphasis on listings 1.17, 1.1, 12.04, *12.06*, and 12.15" in reaching the

38

conclusion that Mr. McIlvain's impairments do not meet or medically equal a Listing. (Tr. 21 (emphasis added).) Although the ALJ did later explain that he found the severity of Plaintiff's impairments "do not meet or medically equal the criteria of listings 12.04 and 12.15" based on consideration of the "paragraph B" and "paragraph C" criteria (Tr. 21-22), the paragraph B and C criteria for Listing 12.06 are the same as the paragraph B and C criteria for Listings 12.04 and 12.15, *compare* 20 C.F.R. § Pt. 404, Subpt. P, App. 1 § 12.06 *with* 20 C.F.R. § Pt. 404, Subpt. P, App. 1 §§ 12.04, 12.15. Further, the ALJ referred to both Plaintiff's subjective complaints of anxiety and his related daily activities in discussing the paragraph B criteria. (Tr. 22.) The undersigned therefore finds Mr. McIlvain's argument that the ALJ did not consider or analyze his impairments in conjunction with Listing 12.06 to be without merit.

### 3.     The ALJ Did Not Err in Concluding That Plaintiff's Mental Impairments Did Not Satisfy Listing 12.06

Mr. McIlvain also argues that the ALJ erred when he found the evidence did not satisfy the paragraph B or C criteria for Listing 12.06, broadly citing his general summary of the medical evidence and the medical opinion of CNP Miller in support of this challenge. (ECF Doc. 7, pp. 15-22.) Since CNP Miller's medical opinion is the only evidence that Mr. McIlvain clearly identifies as inconsistent with the ALJ's findings regarding the paragraph B and C criteria, that is the evidence that will be considered in this Court's analysis.[8]

In support of his finding that Mr. McIlvain's mental impairments did not meet Listings 12.04, 12.06, or 12.15, the ALJ discussed the paragraph B and C criteria as follows:

---

[8] Aside from brief references to CNP Miller's opinion, Plaintiff simply restates his entire factual summary in support of his Step Three arguments, without developed argument to identify what, if any, evidence the ALJ misconstrued or failed to properly consider. (*Compare* ECF Doc. 7, pp. 16-18 *with id.* at pp. 2-3.) The undersigned will not dig through either the evidentiary record or the ALJ's detailed discussion of the same in an attempt to locate errors or inconsistencies that might support Plaintiff's arguments. It is Plaintiff's burden to demonstrate that the ALJ lacked substantial evidence to support his findings at Step Three.

In understanding, remembering or applying information, the claimant has no limitation. The claimant completed high school. He can read and write. (Testimony) He did not require any special education services in school. (1E) The vocational expert described past work as a saw blade sharpener and as a saw operator as semi-skilled, with SVP levels of 4 and 5, respectively. (Vocational testimony) This past work is indicative of the claimant's ability to learn, retain, and carry out job tasks.

In interacting with others, the claimant has a moderate limitation. The claimant lives with his fiancée and his disabled son. He spends time with his mother. He takes medication to get through family get togethers. Anxiety makes it difficult to interact with people. The claimant shops in stores with another person. (Testimony)

With regard to concentrating, persisting or maintaining pace, the claimant has a moderate limitation. The claimant reported racing thoughts and concentration issues. (Testimony) He uses an email account. (1E) He maintained adequate focus to participate in the 43-minute hearing. He completed his own written Function Report. The claimant can shop online. He does not handle finances, due to having no income. He watches movies, watches television, and reads. (3E)

As for adapting or managing oneself, the claimant has experienced a moderate limitation. The claimant cares for his autistic son, and his son's service animal. He has no problem caring for his own personal needs but testified that he sometimes lacks motivation. He did not used to cook, but he has learned to make simple meals for his family such as French fries, frozen meals, and noodles. (3E) He washes bottles, picks up toys, gets his son ready for school, and helps with his learning tasks. His son is in preschool three days per week for three hours per day. The claimant does not transport his son because it makes him anxious. He watches over his disabled sister. (Testimony)

Because the claimant's mental impairments do not cause at least two "marked" limitations or one "extreme" limitation, the "paragraph B" criteria are not satisfied.

The undersigned has also considered whether the "paragraph C" criteria are satisfied. In this case, the evidence fails to establish the presence of the "paragraph C" criteria. The evidence fails to show marginal adjustment or minimal capacity to adapt to changes in the environment or to demands that are not already part of daily life despite ongoing medical treatment and mental health therapy that diminishes the symptoms and signs of her mental disorder.

(Tr. 22.)

In addition to these Step Three findings, the ALJ also discussed Mr. McIlvain's subjective allegations, reported activities of daily living, and medical treatment records at Step Four. (Tr. 23-30.) In that analysis, the ALJ observed that Mr. McIlvain reported that he enjoyed

hunting, fishing, and being outside; he was able to go camping; and he had been in a long-term relationship with his fiancée of six years. (Tr. 26, 28, 29.) He observed some abnormal mental status examination findings at initial mental health appointments in June 2021, but also noted generally mental status exams in 2022 and 2023. (Tr. 26, 27-29.) The ALJ also observed and considered the psychological report of Dr. Humphries from late 2021 wherein it was noted that Mr. McIlvain's testing revealed an "extreme tendency to overstate problems." (Tr. 26-27.) The ALJ also considered medical opinion evidence at Step Four. (Tr. 25, 28, 29-30.) The ALJ found the opinions of his treating nurse provider CNP Miller and consultative examiner Dr. Bauza not persuasive and explained his reasons for doing so.[9] (Tr. 25, 28.) Specifically, as it pertains to CNP Miller's opinions relating to the paragraph B criteria, the ALJ explained:

> She endorsed extreme limitation in social interaction, which is wholly inconsistent with his ability to get along with multiple treating sources, good family relationships, a long-term romantic relationship, and being the parent who cares for a young child while his girlfriend is at work. She endorsed marked limitation in concentration, persistence and pace, but this is contradicted by her normal mental status exams at nearly all medication visits. She endorsed marked limitation in adaptation, but the claimant performs normal daily tasks, adjusts to seeing new medical sources, and has no history of emergency mental health care.

(Tr. 28.) And as it pertains to CNP Miller's opinions relating to the paragraph C criteria, the ALJ explained: "She opined he is unable to function outside of a highly supportive living arrangement, yet he has never been an inpatient and he cares for not only himself, but also for his young autistic son." (*Id.*) Finally, the ALJ found the opinions of the state agency psychological consultants mostly persuasive and concurred in their paragraph B analysis, which found moderate limitations in the three functional areas at issue here.[10] (Tr. 29.)

---

[9] For the reasons set forth in Section VI.B.2-3, *supra*, the undersigned found no merit in Mr. McIlvain's challenge to the ALJ's analysis of the opinions of CNP Miller and Dr. Bauza. Those determinations will not be revisited here.

[10] For the reasons set forth in Section VI.B.4, *supra*, the undersigned found no merit in Mr. McIlvain's challenge to the ALJ's analysis of the opinions of the state agency consultants, and that determination will not be revisited here

Mr. McIlvain argues that the ALJ's paragraph B and C findings are "incorrect and not supported by the record" in light of CNP Miller's opinion that Plaintiff had: extreme limitations in interacting with others; marked limitations in maintaining concentration, persistence, or pace and in adapting or managing himself; and a history of one or more years of inability to function outside a highly supportive living arrangement.  (ECF Doc. 7, pp. 16, 18.)  However, as discussed in Section VI.B.2, *supra*, the ALJ was supported by substantial evidence when he concluded that CNP Miller's medical opinion was "not well supported, and . . . inconsistent with [CNP Miller]'s notes of normal mental status exams . . ., good response to medication, no side effects of ongoing medications (although some were discontinued for side effects), and the ability to perform a wide array of activities."  (Tr. 28.)

As noted above, even if a preponderance of the evidence supports a finding of extreme or marked limitations, this Court cannot overturn the ALJ's finding to the contrary "so long as substantial evidence also support[s] the conclusion reached by the ALJ."  *Jones*, 336 F.3d at 477; *Blakley*, 581 F.3d at 406.  Thus, the question before this Court is not whether substantial evidence supported extreme and/or marked limitations in mental functioning, but rather whether the ALJ *lacked* substantial evidence to support his contrary finding of moderate limitations.  Mr. McIlvain has not met his burden to make this showing.

For the reasons set forth above, the Court finds that the ALJ's Step Three findings as to Listing 12.06 have the support of substantial evidence, and that Mr. McIlvain has not met his burden to demonstrate otherwise.  Accordingly, the undersigned concludes that Mr. McIlvain's second assignment of error is without merit.

## VII.    Recommendation

For the foregoing reasons, the undersigned recommends that the final decision of the

Commissioner be **AFFIRMED**.


January 30, 2026

/s/Amanda M. Knapp
_____
AMANDA M. KNAPP
United States Magistrate Judge



## **OBJECTIONS**

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document.  Failure to file objections within the specified time may forfeit the right to appeal the District Court's order.  *See Berkshire v. Beauvais*, 928 F.3d 520, 530 (6th Cir. 2019); *see also Thomas v. Arn*, 474 U.S. 140 (1985).